IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| CASTULLO HERNANDEZ<br>(former TDCJ no. 766890) | § | |
| v. | § | CIVIL ACTION NO. 6:12cv258 |
| WARDEN SCOTT, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Castullo Hernandez, a former inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights during his confinement in the prison. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. §636(c).

In his complaint and at an evidentiary hearing, Hernandez said that he had been confined for about eight years at the Beto Unit. He had varicose veins prior to his arrival at the unit but these became worse while he was there. In addition, Hernandez said, while he was at the Beto Unit, he contracted staph infections in both of his legs from a towel. He indicated that this happened in 2004.

After he contracted the staph infection in his left leg, Hernandez said, he was treated by Dr. Roe. He began having "bad pains" in his leg, and saw a red line on his leg running down to the ankle, but a nurse told him that he was because of the bandages. The drainage under his bandages began seeping through.

After a "couple of years," Hernandez said, his right leg became infected as well. Both of his ankles were affected. When he was released, he was not given any bandages, and at the time of the hearing, Hernandez stated that he had been out of the hospital for less than a week.

Hernandez testified that the main problem that he suffered at the Beto Unit was caused by the staph infection rather than the varicose veins. He says that X-rays of his legs were taken, and he

1

was told that he had good circulation but that his healing process was deficient. He now has to sleep with his legs elevated. At the time of the hearing, Hernandez stated that he had bandages on both of his legs.

Hernandez testified that he sued Warden Scott because the warden was "slacking up," letting inmates "use dirty clothes to pick up germs on the floor." He stated that the warden was responsible for the operations of the unit.

When asked how he knew that he contracted a staph infection from a towel, Hernandez explained that he went to shower one night, and after he dried off, he started itching badly. The medical department took cultures and found that he had staph and e. coli, so he was laid in as an "emergency walk-up" and put on an antibiotic called Bactrim. He did not recall when this happened, but thought it could have been in 2004.

Hernandez stated that he kept complaining and received treatment on the unit. He went to "telemed" and saw a doctor by video. He stated that the medical personnel "would not diagnose him," although they took cultures occasionally.

Next, Hernandez said that he sued Dr. Clayton, the senior doctor at the Beto Unit, because Hernandez went to his office, but the doctor "would not examine or diagnose him." Instead. Dr. Clayton just told him to go to the pill window. He said that Dr. Clayton "never got up to look at him" but kept giving him Bactrim; Hernandez acknowledged that this "helped him some" but that it was not strong enough.

Hernandez stated that he went to the University of Texas Medical Branch hospital in Galveston (commonly called "John Sealy Hospital"), and they told him that he had good circulation in his legs. The hospital personnel recommended treatment for him, but the medical providers at the unit kept changing it. At one point, Hernandez says, Dr. Clayton was "shocked" by how Hernandez's legs appeared and sent him to Dr. Roe, who sent him back to Dr. Clayton. The doctor told him to use compression stockings but he couldn't because he had open wounds. Hernandez said

that the nurses changed his bandages for him a few times, but then made him do it; he would go to the clinic and they gave him the supplies and told him to do it himself.

The third defendant named in the lawsuit is Tara Patton, whom Hernandez identified as the "acting medical supervisor." He thought that she may have been the practice manager, saying that he believed the practice manager was "over the nurses," but Steve Fields, a correctional nurse present at the hearing, explained that Patton's title was "nursing supervisor," inasmuch as Patton herself is a registered nurse. Hernandez did not indicate that he had seen Nurse Patton herself, but appears to be suing her because of her position of responsibility as a supervisor.

Fields testified that the medical records which he had at the hearing went back only to 2010. These records show that Dr. Clayton referred Hernandez to the wound care clinic at John Sealy Hospital, and he was seen by them via telemed some 20 times between January of 2010 and August of 2011. Fields noted that a nurse at the unit assists with the telemed examination. Hernandez also saw Dr. Clayton some two dozen times during this same time period.

<u>Hernandez's Medical Records</u>

The certified and authenticated medical records furnished at the hearing, despite dating back only to January of 2010, are too extensive to recount in their entirety; accordingly, the Court will summarize only that portion of the medical records detailing Hernandez's interaction with medical providers, including physicians and physician's assistants. These records show that on January 25, 2010, Hernandez saw Dr. Clayton for sores on his leg, and Dr. Clayton noted two lesions on his anterior left lower leg. He noted that Hernandez had chronic stasis ulcers of the left lower extremity and that he had last been seen in the wound care clinic in November of 2009, and ordered a referral to the wound care clinic and gave Hernandez a prescription for pain medication.

On February 23, 2010, Hernandez again saw Dr. Clayton with a complaint of "severe pain" over the stasis ulcers. He noted that Hernandez had a pending appointment with the wound care clinic and that Hernandez had recently been put on antibiotics called Bactrim and clindamycin. He

directed that Hernandez follow up with providers as scheduled, take his medications, and continue dressing changes as ordered.

On March 25, 2010, Hernandez again saw Dr. Clayton, this time for a boil on his buttock with a draining lesion on the perineum. He ordered a tablet of Bactrim and some bandages with tape.

On April 29, 2010, Hernandez saw Dr. Clayton, who noted a large "AV malformation," apparently an arterio-venous malformation, on his right hand. He issued a two-inch Ace bandage for six months, for Hernandez to wrap his hand. He also started medications called furosemide, a diuretic which reduces swelling by removing water from the body, and ranitidine, a medication for relief from heartburn.

On May 5, 2010, Hernandez saw a physician's assistant named Patricia Forni. She stated that Hernandez had a history of chronic venous stasis ulcers on his lower left leg, noting that Hernandez has had treatment in the past with both intravenous and oral medications. Hernandez also complained that he was developing an ulcer on his right leg. He does dressing changes on Mondays, Wednesdays, and Fridays. Hernandez had an appointment with the Hospital Galveston wound care clinic on April 22, but signed a refusal of treatment form because he had a family visit coming during the time that he would have been absent from the unit.

Forni observed that Hernandez had "diffuse varicose veins" noted on his left leg, with hyper-pigmentation, an ulcer on the front of the lower leg and medial ankle, and erythema surrounding each ulcer. His right leg had a small superficial ulcer starting up on his ankle, with the skin being hyper-pigmented, as well as varicose veins. Forni ordered that Hernandez continue changing his dressings three times a week and re-referred him to the wound care clinic at the hospital in Galveston, and ordered an antibiotic called sulfamethoxazole.

A week later, on May 11, Hernandez saw Dr. Clayton asking for a shower shoe pass and pain medication. Dr. Clayton gave him a pass for crutches and a shower shoe pass for 90 days, and prescribed pain medication. On May 17, Dr. Clayton noted that Hernandez was supposed to see the

wound care clinic at the hospital in Galveston. He observed no changes from the previous week and ordered that Hernandez continue to have dressing changes on Mondays, Wednesdays, and Fridays.

On May 25, 2010, Hernandez saw Dr. Roe, complaining that his leg was getting worse. Dr. Roe noted a "chronic problem with venous insufficiency of both lower extremities with recurrent ulcerations" and that Hernandez now has cellulitis on the dorsum of his right foot with "marked recurrent edema." He precribed a diuretic called Lasix (furosemide) and another medication to prevent swelling called spironolactone, as well as a UNNA boot for both lower extremities.[1]

A clinic note from June 18, 2010, reflects that Hernandez came to the clinic for a dressing change. His wounds were cleansed and dried and covered with Acticoat. They were then wrapped with an Unna boot and covered with gauze. The wound beds were dry, without redness or swelling, and no active drainage.

On July 5, 2010, Hernandez saw Dr. Clayton complaining that he wanted stronger pain medication because ibuprofen was not helping. Dr. Clayton ordered that he continue dressing changes, that he be single celled for six months, and ordered pain medication called propoxyphene (Darvocet). Two weeks later, on July 21, an entry in the medical records by Dr. Roe indicates that Hernandez's leg wounds look good and are "essentially epithelialized (i.e. getting covered through the growth of healthy skin tissue).

On August 9, 2010, Dr. Roe noted that Hernandez has been seen repeatedly in the clinic and the WR for chronic venous stasis ulcers of his lower extremities, and that he has "portal HTN" (i.e. high blood pressure) secondary to cirrhosis of the liver. Dr. Roe stated that Hernandez would return next week for a UNNA boot change and that the doctor would see him then.

On October 19, 2010, Hernandez saw Forni. She stated that Hernandez's right UNNA boot was discontinued on October 12, but he still had the left one. Hernandez wanted his cane back,

---

[1]A UNNA boot, also known as "Unna's boot," is a compression dressing for varicose veins or ulcers made in part from zinc oxide paste. *See* http://www.merriam-webster.com/medical/unna's%20boot; www.virginia.edu/uvaprint/HSC/pdf/09032.pdf.

instead of the crutches, and TED (support) hose, as well as replacement of a moleskin in his medical boots. Hernandez wanted refills of Benadryl, which he takes for the itching in his leg, and body lotion for the dry skin on his legs. Forni ordered a referral to the Brace and Limb Clinic for replacement of the moleskin to prevent the boots from rubbing his leg and for TED hose, and gave him a cane pass for one year. Hernandez also had his dressing changed that day; his wounds were cleansed with wound cleaner and Acticoat placed over the wounds, an UNNA boot was applied, and a gauze wrap was placed. Another dressing change is recorded on November 2, 2010.

On November 9, 2010, Hernandez saw a nurse practitioner named Kerry Scruggs, who noted that the wound on his right leg had healed up. The wound on Hernandez's left leg was healing slowly, and was not hot to the touch and had no purulent drainage. He ordered that the area be debrided and cleaned, with Acticoat and a UNNA boot applied.

One month later, on December 9, 2010, Hernandez saw Dr. Clayton, who ordered that Hernandez ne rescheduled in the wound care clinic. Dr. Clayton also renewed Hernandez's medications, including ibuprofen 800 mg and an asthma inhaler.

On January 20, 2011, Dr. Clayton saw Hernandez in response to a sick call in which Hernandez had requested renewal of restrictions, TED hose, and his medications. Dr. Clayton noted that Hernandez was undergoing twice-daily wound care with through chemical debridement (santyl ointment). At that time, Hernandez said that his chronic venous ulcers were getting "much better," and the doctor observed that these appeared to be "healing well with limited drainage." He ordered that Hernandez continue with the wound care orders and receive TED hose for 90 days, and that he be single celled for six months. On March 16, 2011, Hernandez again saw Dr. Clayton, who noted that Hernandez was improving and "doing well."

Four weeks later, on April 12, 2011, Hernandez asked for renewal of his medications and passes. Dr. Clayton stated that his dressings were dry without drainage, and ordered that his medications and passes be renewed. On June 27, Dr. Clayton discontinued Hernandez's

6

prescriptions for diphenhydramine (Benadryl), and renewed his prescription for a pain reliever called naproxen and his asthma inhaler. He also renewed Hernandez's single cell pass.

In July of 2011, Hernandez could not come to an appointment because the unit was locked down. His medications were renewed in August, and on September 26, 2011, he was given a 30 day shower shoe pass and his single cell was given a 90 day renewal.

On November 3, 2011, Hernandez saw Dr. Clayton for renewal of his medications. At this time, he received prescriptions for topical body lotion, diphenhydramine, naproxen, and a cream called triamcinolone. However, on January 3, 2012, the wound care provider recommended that they stop giving Hernandez pain relievers from the medication family known as NSAID's. Dr. Clayton gave Hernandez a prescription for acetaminophen (Tylenol), which is not an NSAID.

Two weeks later, on January 18, 2012, Hernandez saw Dr. Clayton, who noted that Hernandez's right leg showed "large areas of stasis dermatitis with hyper-pigmentation from hemosiderin deposits." He gave wound care orders flushing the wound, using an alcohol swab to remove excess tissue, application of Acticoat, covering it with a foam dressing, putting on a gauze bandage roll (Kerlex), and application of a compression dressing (the UNNA boot). This process was to be repeated on Mondays, Wednesdays, and Fridays.

These entries recounted above are for Hernandez's visits with the doctors and physician's assistants, and represent only a very small portion of Hernandez's medical records. These records also contain a very large number of clinic notes indicating that Hernandez was seen by nursing staff, as well as a number of wound care assessment forms showing occasions when he was seen by the wound care providers via telemed.

## Legal Standards and Analysis

Hernandez's primary complaint concerns allegations of deliberate indifference to his serious medical needs. The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235,

7

1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should

have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The case of Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs. In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease. In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure. He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back. He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim. She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids. Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment. When he returned, Dr. Kim did not follow the free-world physician's advice to transfer Stewart to another facility for physical therapy. Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities. She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour. He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

9

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics. He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die. Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen." Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility. The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment. The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

In the present case, Hernandez's complaints were consistently responded to, including the receipt of numerous prescriptions and wound dressings. The assertion in his complaint that "the defendants essentially left his medical condition unattended" is plainly belied by the medical records. Banuelos, 41 F.3d at 235 (medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs). While there is no question that Hernandez consistently complained of the problems with his legs, this medical need has been consistently responded through repeated visits with wound care doctors (albeit by video), numerous visits with medical providers at the unit, and the provision of medication and dressings for his wounds. He has fallen well short of showing that the prison medical personnel refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Domino, 239 F.3d at 756.

The fact that this treatment was not as successful as Hernandez would have liked also does not show that the medical personnel were deliberately indifferent to his serious medical needs.

Johnson, 759 F.2d at 1238; Norton, 122 F.3d at 293. Hernandez's claim against the medical personnel, Dr. Clayton, Dr. Roe, and Nurse Patton, is without merit.[2]

Hernandez also sues Warden Scott, the senior warden of the Beto Unit. He did not state any factual basis for claims against Scott in his complaint, but at the evidentiary hearing, he said that Scott was "slacking up" by "letting inmates use dirty clothes to pick up germs off the floor." When the Court pointed out that Warden Scott was not around supervising individual inmates, Hernandez stated that he sued the warden because Scott was "responsible for the Beto Unit." He further stated that he contracted the staph infection from the dirty towel in 2004.

The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987). In this case, Hernandez has not shown that Warden Scott was personally involved in a constitutional deprivation, that Scott acted wrongfully and that this wrongful action was causally connected to a constitutional deprivation, or that Scott implemented a constitutionally deficient policy which was the moving force behind a constitutional deprivation. Instead, he simply asserted that Warden Scott "was responsible for the Beto Unit." This is a pure claim of *respondeat superior* liability, which is not cognizable in a Section 1983 lawsuit.

---

[2] In addition, Hernandez has not shown that Nurse Patton should be liable in her supervisory capacity for any action taken by other members of the nursing staff. Hernandez has wholly failed to show that any of the nurses were deliberately indifferent to his serious medical needs, and thus he cannot maintain a *respondeat superior* claim against the supervisor of the nursing staff. *See* Gibbs v. King, 779 F.2d 1040, 1046 n.6 (5th Cir.), *cert. denied* 476 U.S. 1117 (1986) (absent primary liability, there can be no supervisory liability).

In addition, Hernandez indicates that he contracted the staph infection from the dirty towel in 2004, more than seven years prior to filing suit in 2012. The Fifth Circuit has explained that because there is no federal statute of limitations for actions brought pursuant to 42 U.S.C. §1983, federal courts borrow the forum state's general personal injury limitations period. Ali v. Higgs, 892 F.2d 438, 439 (5th Cir. 1990); Owens v. Okure, 488 U.S. 235, 249-50 (1989). The appropriate period in Texas is two years. Burrell v. Newsome, 883 F.2d 416, 420 (5th Cir. 1989); Ali,892 F.2d at 439. A claim accrues when the plaintiff learns of the facts that support his claim. Hendrix v. Thompson, 436 Fed.Appx. 359, 2011 WL 3476663 (5th Cir., August 9, 2011), *citing* Piotrowski v. City of Houston, 51 F.3d 512, 516 (5th Cir. 1995).

In this case, Hernandez stated that he became aware of the problem and that he began complaining to medical personnel almost immediately. To the extent that Hernandez may be complaining that Warden Scott was responsible for unsanitary practices at the Beto Unit, which led to Hernandez contracting a staph infection from a dirty towel, his testimony indicates that the two-year statute of limitations expired on this claim well before January 26, 2012, the date that Hernandez signed the complaint. Thus, Hernandez's claim against Warden Scott is barred by limitations as well as lacking in merit.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Hernandez's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous.  28 U.S.C. §1915A.  It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.  Finally, it is

ORDERED that a copy of this opinion shall be sent to the Clerk to the Administrator of the Strikes List for the Eastern District of Texas.

So **ORDERED** and **SIGNED** this **4**   day of  **December, 2012.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE